**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**HINDS COUNTY REPUBLICAN PARTY,**                                          **PLAINTIFFS**
**ET AL.**

**V.**                                                                    **CAUSE NO. 3:12-CV-653-CWR-FKB**

**HINDS COUNTY, MISSISSIPPI, ET AL.**                                        **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

In this case, the Hinds County Republican Party and a Republican elected official in Hinds County allege that the County's Board of Supervisors violated state and federal law when it redrew the boundaries of several electoral districts. Having considered the evidence, the arguments, and the law, the Court presents its findings and conclusions below.

**I.      Factual and Procedural History**

**A.      Background**

Hinds County is the largest county in Mississippi by population. The County is home to the City of Jackson (the State's most populous city), the State Capitol, and much of the machinery of State government, with all of the infrastructure that entails.

Most of the County's residents are African-American. The remaining residents are largely Caucasian. The County has relatively few citizens of other races and nationalities.

The evidence shows that most of the County's black residents vote to elect Democrats into office, while a great portion of the County's white residents vote to elect Republicans into office. Between the demographics and this bloc voting, most elected officials within Hinds County—such as the County Supervisors, the Mayor of Jackson, City Councilpersons, etc.—are African-American Democrats.

Hinds County has five Supervisors. One Supervisor is elected from each of Districts One through Five. When this suit was filed, the Supervisors for Districts One, Two, Three, and Five were black Democrats. Supervisor Phil Fisher, from District Four, was a white Republican. Fisher is now the Mayor of Clinton, Mississippi.[1] The District Four Supervisor was a white Republican from before this suit was filed up until the November 2019 election.

In the wake of the 2010 Census, the Board of Supervisors was required to redraw the boundaries of County-level elected offices. The Board hired Derrick Johnson as a consultant to amend the maps. A total of 119 precincts in the County could be adjusted. Johnson presented several different maps to the Board, Maps 1-4. The Chairman of the Hinds County Republican Party proposed an alternative map—Map 5. On February 28, 2011, the Board voted to approve Map 1.

All agree that the County was due to be redistricted to some extent. Two of the five Supervisors' Districts were malapportioned after population shifts. It is the means of the redistricting, *i.e.*, how the maps were drawn, that is disputed. The plaintiffs in this suit, the Hinds County Republican Party and Fisher, allege that the Board redistricted to frustrate white voters, white elected officials, and Republicans. The County responds that the majority of the Board redistricted in the interests of partisanship and incumbency: in other words, that they redrew the

---

[1] Fisher was first elected Supervisor in 2007 and reelected without opposition in 2011. After resigning to become Mayor of Clinton, an interim supervisor (Robert Walker) was appointed to that seat. Cheryl Lasseter, *Hinds County names two interim supervisors*, WLBT, July 1, 2013, https://www.wlbt.com/story/22732646/hinds-county-names-two-interim-supervisors/. Tony Greer, a Republican, was elected in a special election in 2013. Greer did not seek reelection, but instead ran for Central District Public Service Commissioner. Jimmie E. Gates, *Tony Greer withdraws from Hinds County supervisor's race*, Clarion Ledger, Mar. 2, 2015, https://www.clarionledger.com/story/politicalledger/2015/03/02/tony-greer-supervisor-public-service-commission/24256971/. Republican Mike Morgan was elected Supervisor for District Four in 2015, defeating Vern Gavin, the former Hinds County Administrator, by about 440 votes. Jimmie E. Gates, *Is party or race more important? In January, there will be no white officials on Board of Supervisors, a first in modern history*, Clarion Ledger, Nov. 25, 2019, https://www.clarionledger.com/story/news/politics/2019/11/20/race-political-party-hinds-county-mississippi-elections/2512260001/ [hereinafter Gates, *Party or race?*].

lines to beef up their districts with more Democrats, so as to increase the likelihood of their own reelection.

The plaintiffs filed this case in September 2012, slightly less than a year after the county elections, but on the cusp of the elections for the County Election Commissioners. The Chairman of the Hinds County Republican Party acknowledged in his testimony that the suit was "last minute." A four-day hearing on preliminary injunctive relief was held the following month. This Court denied the plaintiffs' motion from the bench. The election was upon us and the evidence was not strong enough to warrant an injunction. *Accord Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014).

There was significant doubt as to whether either side wished to proceed with the case after the hearing. In the first half of 2013, the parties failed for five months to contact chambers and schedule a pretrial conference. In the second half of 2013, the plaintiffs failed for five months to comply with the Scheduling Order, necessitating a Show Cause Hearing in 2014.

The parties ultimately decided to take no discovery and, later, decided that a trial was unnecessary. They instead submitted their case for adjudication on the hearing record and additional evidence produced via affidavit. This case was paused for years while the parties ordered the hearing transcript, secured their affidavits, and filed their briefs.

Unfortunately, this case then sat dormant for additional years as we awaited the Supreme Court's decisions in *Gill v. Whitford*, 138 S. Ct. 1916 (2018) and *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), cases the parties and the Court hoped might provide additional guidance in redistricting law.[2] The guidance that came was partial. Still, this Court is ultimately responsible

---

[2] The Court, with the agreement of the parties, stayed this case on two separate occasions while waiting for the decisions in these two cases. *See* Docket Nos. 66 and 69.

for the delay in this case. The Court expresses its regret to the parties and the public for the length of time it took to reach a decision in this important matter.

Despite the election having come and gone, and despite a new cycle of redistricting on the horizon, recent case law from the Fifth Circuit indicates that this dispute is not moot. *See Thomas v. Bryant*, No. 19-60133, Docket No. 142 (5th Cir. Sept. 23, 2019). The Court will begin by describing the evidence the plaintiffs presented at the hearing on preliminary injunctive relief. The defendants' evidence, to the extent it is relevant, will be mentioned where necessary.

### B.    The Plaintiffs' Evidence

The plaintiffs' attorney argued in his opening statement that the Supervisors engaged in "a decided, deliberate effort to violate the rights of white people." More colloquially, he said, "they blackened up District 4 and 1."

At the time of the hearing, seven white people held County-level elected offices: Circuit Clerk Barbara Dunn, County Court Judge William Skinner, District One Election Commissioner Marilyn Avery, District Four Supervisor Phil Fisher, District Four Constable Jon Lewis, District Four Election Commissioner Connie Cochran, and District Four Justice Court Judge Jimmy Morton.[3]

Commissioner Avery was the plaintiffs' first witness. She testified that she had served as Election Commissioner for approximately 16 years and had qualified to run for re-election in 2012. Out of the 119 Precincts in Hinds County, she said, the Supervisors had moved nine of them. All five Districts were affected in some way. In her District specifically, the Supervisors had taken out Precinct 1 and inserted Precincts 39 and 41. Commissioner Avery opposed the changes.

---

[3] Hinds County's Circuit and Chancery Judges are elected to State offices.

Testimony cast doubt on whether redistricting would actually injure Commissioner Avery. She admitted that she had "not campaigned at all." She did not elaborate, but a possible explanation for that is the various public controversies about Commissioner Avery and her colleagues that term.[4] We will return to Commissioner Avery later.

The plaintiffs then called Pete Perry, the Chairman of the Hinds County Republican Party. Perry arrived with a wealth of general knowledge about Hinds County elections and had followed this redistricting process closely. He testified that the 2010 Census left Hinds County malapportioned, which means that redistricting was warranted. Perry also testified that racial bloc voting—an elemental fact of Mississippi history, all agreed—continues to the present day.

Perry was apprehensive about this redistricting process because of the County's mapping consultant, Johnson. Perry objected to the County paying Johnson $40,000 for the mapping effort[5] and feared that Johnson could not be impartial because he was then the Chairman of the Mississippi State Conference NAACP.[6]

Perry became more concerned when two Supervisors made statements that he perceived to be racist. First, when District One Supervisor Graham was asked about the proposals at the Supervisors' February 28, 2011 meeting, he responded, "I'm not running to lose." Graham, who

---

[4] *See* Ward Schaefer, *Hinds Election Feud Heats Up*, Jackson Free Press, Nov. 1, 2010 ("Graves also accused District 1 Commissioner Marilyn Avery of grabbing her and calling her 'the b-word,' an allegation Avery reportedly admitted at Wednesday's meeting."); *Hinds County Election Commissioner Clark voted out of office*, WAPT, Nov. 7, 2012 ("The commission has been plagued by bitter internal fighting. Commission leaders called it a clash of personalities. But some county officials said all the fighting was stopping progress and led to the most recent problem with the commission -- failing to get absentee ballots out on time.").

[5] The technology behind redistricting has improved so significantly in the last decade that expensive mapping consultants may no longer be necessary. A college sophomore identified the § 2 violation in *Thomas v. Bryant*, for example, and websites allow citizens to draw Congressional Districts with the click of a button. *See* Adam Ganucheau, *How a College Student Exposed Racial Gerrymandering, Prompted a Lawsuit and Forced Mississippi to Redraw a Voting District*, Miss. Today, Mar. 27, 2019, https://mississippitoday.org/2019/03/27/how-a-college-student-exposed-racial-gerrymandering-prompted-a-lawsuit-and-forced-mississippi-to-redraw-a-voting-district/; Aaron Bycoffe et al., *Mississippi – The Atlas of Redistricting*, FiveThirtyEight, https://projects.fivethirtyeight.com/redistricting-maps/mississippi/.

[6] The video of the February 21, 2011 work session suggests that Perry and Johnson frequently disagree with each other.

is black, had won his 2007 race by approximately 90 votes. Graham also told Perry that he was only considering Maps 1, 2, and 3, all of which would have increased black voting age population (BVAP) in his district. Perry told the Court, "you're looking at 95, 98 percent of those [persons] going to vote for the Democratic candidate."

The second statement happened when Perry complained to the then-President of the Board, George Smith, about the unfairness of the redistricting process. Smith responded, "Pete, this is a black county. We have black leadership. We're going to hire black people. We're going to elect black people. Just get over it." Perry testified that he "took offense" to that, believing that Smith was "telling me and all the other white people that were in the county and all the other Republicans that *We're going to do what we want to do*, and -- you know, *We're going to do it and just*, as he said, *get over it*."

Perry's concerns extended to the maps themselves. He described for the Court the defects he saw with the County's chosen map: it shuffled 23,000 voters, split precincts, and split communities of interest.[7] Precinct 91, for example, moved from District Four to District Three, while Precinct 94 moved in the opposite direction. The net effect was to move "754 more black votes into District 4," Perry said. He thought that irrational: "by doing that you are adding people into District 4 where you need to be getting people out of" that District. In contrast, Perry's proposed map would have fixed the malapportionment, he says, by moving Precinct 22 "from District 3 to District 2" and moving "Precinct 91 from District 4 to District 3."

---

[7] The defendants later put on testimony disputing that they split communities of interest.

Still, Perry acknowledged that District 1 remained a "swing district." He also acknowledged that after redistricting, the white voting age population (WVAP) in District 4 remained above 50%.[8]

Perry then testified as to procedural problems he believed occurred during the redistricting process. He said that the maps had not been provided before the meeting for review by the public or by Supervisor Fisher (who was calling in from his deployment in Afghanistan), in violation of Mississippi's open meetings law. Perry then objected to the break the Board took before it voted on the proposed maps, saying that Supervisor Peggy Hobson Calhoun later admitted to him that Board members went into a back room and agreed on their vote in advance, which would be another violation of Mississippi's open meetings law. According to Perry, Supervisor Calhoun told him the following:

> You know, we didn't adopt the plan that everybody agreed on to do. . . . When we went into recess, we all agreed that we were going to go back out and [Supervisor] Doug Anderson was going to make the motion to adopt plan 3. And we got out there and Doug wouldn't speak and Doug wouldn't speak. So, finally, I decided, well, you know, I like plan 1 better. They wanted plan 3. But of all the ones that were there, I thought plan 1 was the fairest one of the three. And so I made the motion for plan 1.

At the time, the Supervisors had not gone into Executive Session. Perry added, "it wasn't anything that seemed unusual to her or, quite frankly, to me, because I'm used to seeing that happen."

Next, the plaintiffs called Judge Morton, the elected Justice Court Judge from District Four. He testified that he, Commissioner Avery, Commissioner Cochran, and Constable Lewis, all white Republicans, met with Johnson several days before the Supervisors' meeting to come

---

[8] The before-and-after summary statistics of the redistricting, which were introduced into evidence as D-1, are attached to this opinion as Appendix A.

up with Map 4. Judge Morton stated that they told Johnson what should be in the Map, and that Johnson did it. Johnson had presented their Map at the meeting, Judge Morton agreed.

Constable Lewis then took the stand and confirmed all of Judge Morton's testimony. He added that Johnson was the one who had initiated the meeting with the white Republican group, and then had "kept in regular contact with us." The meeting to draw the map took about four hours, he said.

The last witness to testify for the plaintiffs was Supervisor Fisher. In part, Supervisor Fisher testified about his feelings of being excluded from the County's redistricting process. He was not consulted on the maps, he said. But Supervisor Fisher also spoke about what he believed to be a pattern of racial animus by his colleagues.

For example, during a 2008 executive session discussion regarding minority contracting, Supervisor Fisher asked, "Why do we have a minority contractor here? Are they paid? . . . What do they do for the money they're paid for and who pays them?" To which Supervisor Anderson responded, "It doesn't matter who does the work as long as a black man gets paid." Supervisor Fisher continued, "Supervisor Peggy Calhoun, Supervisor Doug Anderson, Supervisor Kenny Stokes have all said that . . . 'We must do business with black businesses, black-owned businesses.'"

Supervisor Fisher added more context to the redistricting issue in particular. In fall 2012, he said, his colleague during that term, Supervisor Stokes, asked him, "When are you white folks going to take this [redistricting plan] to court?"[9] Supervisor Fisher stated that he had spoken to the Department of Justice during the preclearance process and objected to the redistricting map's treatment of white persons.

---

[9] It must be noted that at no time did Supervisors Smith and Stokes serve together; Stokes defeated Smith in the Hinds County Democratic Primary of August 2, 2011.

Supervisor Fisher then testified about what he believed to be the specific effects of the new map:

> Q. And what does that do to your chances as a white Republican for winning?
> A. Well, it severely hampers them. I have campaigned vigorously in black neighborhoods and in black cities in the 4th district trying to get black votes, okay, making the effort to get black votes; and it doesn't work out that way. Democrats vote for Democrats. Okay.

After Supervisor Fisher's testimony, the plaintiffs rested. They later put on a brief rebuttal by calling Perry. This rebuttal, and their post-hearing affidavits, reinforced the events and themes already described in detail and need not be repeated.

## II.     Legal Standard

"In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." Fed. R. Civ. P. 52(a)(1).

On appeal, "findings of fact are reviewed for clear error and legal issues are reviewed de novo." *Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*, 824 F.3d 507, 515 (5th Cir. 2016) (quotation marks and citation omitted). "A finding is clearly erroneous when there is no evidence to support it, or if the reviewing court, after assessing all of the evidence, is left with the definite and firm conviction that a mistake has been committed." *Id.* (quotation marks and citation omitted). A factual finding is not clearly erroneous when "there are two permissible views of the evidence." *Id.* (quotation marks and citation omitted).

## III.     Discussion

### A.     Federal Claims

The Court will take up the plaintiffs' federal claims in order of their strength.

###### 1.      Partisan Gerrymandering

In a partisan gerrymandering claim, "a districting map is alleged to be unconstitutional because it makes it too difficult for one party to translate . . . support into seats." *Rucho*, 139 S. Ct. at 2499. Here, the plaintiffs say, the Board's redistricting process excessively favored Democrats over Republicans, in violation of the Constitution.

The best fit of the evidence to the law is that the Hinds County Board of Supervisors engaged in slight partisan gerrymandering. The majority of Supervisors—the Democrats—were motivated to secure their respective reelections and moved a handful of precincts to accomplish that end. The specific changes are shown in Appendix A to this opinion, but their degree can be summarized by plaintiffs' counsel, who said during questioning of a Supervisor, "when you take a district that's barely white, 51.89, and go to 50.68, that helps the Democrat, doesn't it? By increasing the black and decreasing the white percentage, that helps a Democrat, doesn't it, according to your own definition of who votes which way in this state?" His line of questioning reveals how small the changes were. And, as the discussion in the next section will show, there is insufficient evidence to prove that this slight change has impacted the capacity of white Republicans to obtain elective office in Hinds County.

In any event, even if the Supervisors had engaged in more severe partisan redistricting, all agree that the Supreme Court's decision earlier this year in *Rucho* forecloses this theory of relief. The Court acknowledged that "[e]xcessive partisanship in districting leads to results that reasonably seem unjust," *id.* at 2506, but concluded that such claims "present political questions beyond the reach of the federal courts," *id.* at 2506-07. "There are no legal standards discernible in the Constitution for making such judgments, let alone limited and precise standards that are clear, manageable, and politically neutral," it reasoned. *Id.* at 2500.

The consequence of the Supreme Court's ruling is not disputed by the parties. This claim cannot proceed.

## 2. Racial Gerrymandering

The plaintiffs next allege that the Supervisors discriminated on the basis of race in violation of the Fourteenth Amendment.

"[T]he basic principle is straightforward: Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination. . . . This rule obtains with equal force regardless of the race of those burdened or benefited by a particular classification." *Miller v. Johnson*, 515 U.S. 900, 904 (1995) (quotation marks and citations omitted). In the voting rights context, this means that "redistricting legislation that is so bizarre on its face that it is unexplainable on grounds other than race, demands the same close scrutiny that we give other state laws that classify citizens by race." *Id.* at 905 (quotation marks and citation omitted).

The particular legal standard is as follows:

> In *Arlington Heights*, the Supreme Court set out five nonexhaustive factors to determine whether a particular decision was made with a discriminatory purpose, and courts must perform a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. Those factors include: (1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body. Legislators' awareness of a disparate impact on a protected group is not enough: the law must be passed *because of* that disparate impact. The challengers bear the burden to show that racial discrimination was a substantial or motivating factor behind enactment of the law; if they meet that burden, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor.

*Veasey v. Abbott*, 830 F.3d 216, 230–31 (5th Cir. 2016) (en banc) (quotation marks and citations omitted) (emphasis in original).

In this case, the crux of the plaintiffs' race discrimination claim was the statements of the Supervisors—two contemporaneous and one older—and the departures from the normal procedural sequences. We begin with the statements.

Review of the video of the February 28 meeting shows that Supervisor Graham's comment about "not running to lose" has been taken out of context. At minute 55 of the recording, he was asked whether a Republican would have a chance running in his District—not whether a white person would have a chance. Supervisor Graham's response was entirely partisan, not racial.

Next is Supervisor Smith's remark that "this is a black county. We have black leadership. We're going to hire black people. We're going to elect black people. Just get over it." The Court will assume without finding that the comment was made. Even then, it is not possible to determine whether it was a simple statement of fact or evidence of race discrimination. In common terms—if we are speaking plainly, like regular people—Hinds County *is* "a black county." It *does* have black leadership. Statistically speaking, it will hire black people and elect black people.[10]

The Fifth Circuit has been very cautious about when to interpret legislators' statements as racist statements, because "[p]roving the motivation behind official action is often a problematic undertaking." *Veasey*, 830 F.3d at 230.[11] In speaking about a legislature, for example, the appellate court has endorsed the Supreme Court's statement that "[w]hat motivates one legislator

_____

[10] Mississippi's population is dispersed in ways that results in casual references to "black" or "white" counties. For example, plainly speaking, one may describe Tishomingo County as a "white" county, since more than 95% of its citizens are white, and Jefferson County as a "black" county, as more than 85% of its residents are African-American. *See* IndexMundi, Mississippi White Population Percentage, 2013 by County, https://www. indexmundi.com/facts/united-states/quick-facts/mississippi/white-population-percentage#map (last visited Jan. 8, 2020); IndexMundi, Mississippi Black Population Percentage, 2013 by County, https://www.indexmundi.com /facts/united-states/quick-facts/mississippi/black-population-percentage#map (last visited Jan. 8, 2020).
[11] As a dissent explained, "inflammatory and unsupportable charges of racist motivation poison the political atmosphere and tarnish the images of every legislator." *Veasey*, 830 F.3d at 281–82 (Jones, J., dissenting).

to make a speech about a statute is not necessarily what motivates scores of others to enact it." *Id.* at 233 (citation omitted).

Perry's offense is understandable. No one likes being told to "get over it."[12] But a discourteous statement is not necessarily a racist statement. A belief that "the law was passed with a discriminatory purpose" is not enough to sustain a claim. *Id.* at 234.

The last direct evidence supporting the constitutional claim concerns the 2008 exchange between Supervisors Fisher and Anderson. As described above, Supervisor Fisher asked, "Why do we have a minority contractor here? Are they paid?" Supervisor Anderson responded, "It doesn't matter who does the work as long as a black man gets paid."

The parties skirmished about minority contracting throughout the hearing. The Court suspects that it is part of a larger battle with more moving parts than were brought to light in this suit concerning redistricting. Nevertheless, the Court finds that Supervisor Fisher's statements were insensitive – it is obvious why governments have minority contracting programs, and obvious that they should be paid like any other contractor – and that Supervisor Anderson's was in fact racially discriminatory. Claiming that nothing else matters as long as a member of a particular race is paid is the very definition of racism.

There is little evidence that Supervisor Anderson's 2008 remark had any impact on the 2011 redistricting, however, much less the minority contracting program itself. Supervisor Calhoun explained at the hearing before this Court that the data on "total dollars spent" show that Hinds County "spend[s] far more monies with the white-majority vendors, suppliers and

---

[12] Saying "get over it" is dismissive of criticism and tends to be counterproductive, as it prolongs the controversy. *See, e.g.*, Toluse Olorunnipa, *'Get over it': Mulvaney's Twin Admissions put Trump at the Center of Emoluments and Ukraine Controversies*, Wash. Post, Oct. 17, 2019 ("Mulvaney's retort to those charges came in a three-word mantra that now forms the central theme of the White House impeachment response: 'Get over it.'"); Adam Liptak, *Antonin Scalia, Justice on the Supreme Court, Dies at 79*, N.Y. Times, Feb. 13, 2016 ("He was often asked about the *Bush v. Gore* decision at public appearances. His stock response: 'Get over it.'").

consultants or what have you than we do blacks." It is simply too difficult to credit that Supervisor Anderson's inappropriate statements had any bearing, on anything, to sustain this claim of racial discrimination in violation of the Constitution.

What remains is the plaintiffs' procedural objection, which they have also articulated as independent state-law causes of action. The plaintiffs' theory under Mississippi's Open Meetings Act is discussed in full below—and the Court believes it has merit. (The plaintiffs' procedural objections under Mississippi's Election Code, also discussed below, cannot be sustained.)

Crediting the plaintiffs' Open Meeting Act violation as supporting one of the *Arlington Heights* factors, though, nevertheless leaves a record with inadequate evidence of unconstitutional race discrimination. The redistricting of Hinds County's five Districts is not close to being so bizarre that it must be explained by racial discrimination, nor have the plaintiffs put on statistical proof of such. Accordingly, this claim too cannot proceed.

### 3. Section 2 of the Voting Rights Act

A political subdivision violates § 2 of the Voting Rights Act:

> if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301(b). "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

The plaintiffs must begin by proving the three *Gingles* requirements. First is that "the racial group is sufficiently large and geographically compact to constitute a majority in a single-

member district." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425 (2006)

(quotation marks and citation omitted). Second, the plaintiffs must prove that "the racial group is

politically cohesive." *Id.* The third requirement is that "the majority votes sufficiently as a bloc to

enable it usually to defeat the minority's preferred candidate." *Id.* (brackets and ellipses omitted).

"[T]he *Gingles* factors cannot be applied mechanically and without regard to the nature of the

claim." *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993).

If these three factors are established, courts are then to consider "the Senate factors":

1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. The extent to which voting in the elections of the state or political subdivision is racially polarized;

3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. Whether political campaigns have been characterized by overt or subtle racial appeals; [and]

7. The extent to which members of the minority group have been elected to public office in the jurisdiction.

*Gingles*, 478 U.S. at 36–37 (quotation marks and citations omitted). The Senate factors are

"neither comprehensive nor exclusive," and "there is no requirement that any particular number

of factors be proved, or that a majority of them point one way or the other." *Id.* at 45 (quotation marks and citation omitted).

> In requiring federal courts to consider the totality of circumstances, Congress has made clear that, again in the [Supreme] Court's words, whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality and on a functional view of the political process. At the same time, federal courts are reluctant to interfere with legislative decisions, especially when they are decisions by state or local legislative bodies, and when the decisions concern issues as sensitive as those regarding who votes, how they vote, and what districts they vote in.

*Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 674–75 (S.D. Tex. 2017) (quotation marks and citations omitted).

In this case, the § 2 claim fails at the third *Gingles* factor.

Set aside for a moment that white persons in Hinds County have historically not been prevented from voting in the manner that African-Americans obviously were. *See, e.g.*, *Mississippi State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400, 402 (5th Cir. 1991) ("Mississippi has a long history of using voter qualifications and registration procedures to impede black citizens' participation in the political process."). That is not the threshold question. The issue today is that the plaintiffs have not established, either by publicly available evidence or expert statistical analysis, that African-American voters in Hinds County vote sufficiently as a bloc to usually to defeat white voters' preferred candidate.

We start with the evidence observable to any informed person paying attention.[13] The number of white County-level elected officials has substantially decreased in the years since this case was filed. It is not obvious whether that happened as a result of the redistricting or of other factors.

---

[13] The Court will take judicial notice of who has been elected to office in Hinds County in the intervening years.

Commissioner Avery had won in 2004 and 2008 as a white Republican. She may have lost in 2012 because of the voters' perception of disarray mentioned earlier,[14] or because she failed to make any effort to campaign. Statistical evidence submitted by the plaintiffs after the election, however, showed that it was not due to the redistricting. Even if Commissioner Avery had run in 2012 in a district without Precincts 39 and 41—*i.e.*, even if there had been no redistricting—her opponent would have won with 50.8% of the vote.

Other departures of white elected officials are readily explainable by non-racial reasons. Circuit Clerk Barbara Dunn retired after a long career in the public eye. Her base of support turned out and helped install her deputy of 18 years, Zach Wallace, who is black, as the new Clerk.[15] Commissioner Cochran lost in 2015 by 112 votes.[16] Constable Lewis lost in 2015 by 211 votes, in a race with a third-party candidate who siphoned off 215 votes.[17] Judge Skinner won reelection in 2014,[18] then declined to run again in 2018. He instead threw his hat into the ring for a Mississippi Court of Appeals spot, which meant he ran in a district covering one-fifth of the state rather than just one county.

Until the most recent election cycle, District Four has continuously elected a white Republican to its Justice Court seat (Judge Morton).[19] Judge Morton did not seek reelection. In the race for that open seat, Kenny Lewis, a Democrat, defeated his Republican opponent, Tiffany

---

[14] Of the three Election Commissioners to face a challenge in November 2012, voters replaced two of them: Commissioner Avery and Commissioner Clark, a black man. *See* WAPT, *supra* note 4.

[15] Perry admitted that Dunn had defeated black opponents in the Democratic primary and the general elections. Similar testimony was presented about Malcolm McMillin, Charles Barbour, Nicki Boland, and Lloyd Paxton.

[16] *Longtime Hinds County Election Commissioner loses race*, WJTV, Nov. 21, 2016, https://www.wjtv.com /news/longtime-hinds-county-election-commissioner-loses-race/.

[17] Jimmie E. Gates, *Hinds constable contests election*, Clarion-Ledger, Nov. 24, 2015, https://www.clarionledger .com/story/news/2015/11/24/longtime-constable-contests-election/76312814/.

[18] Skinner lead both of his African-American opponents, one of whom was a former Circuit Judge, appointed by a popular Republican governor, in the general election and he defeated that opponent in the run-off election. *See* Hinds County, Past Election Results (Nov. 25, 2014), http://www.co.hinds.ms.us/pgs/apps/electionresults.asp.

[19] Justice Court Judges run for office with partisan affiliations. *See* Miss. Code Ann. § 23-15-297(e); *see also* State of Mississippi Judiciary, Admin. Office of Courts, About the Courts, https://courts.ms.gov/aboutcourts/ aboutthecourts.php ("Justice Court judges are the only Mississippi judges elected in partisan races.").

Horton-Williams, 63%-37%. Both candidates are African-American. And for many decades, up until two months ago, District Four continuously elected a white Republican to represent it on the Board of Supervisors. We do not know whether Supervisor Mike Morgan lost in November 2019 because he changed his party affiliation to run as an Independent rather than as a Republican,[20] or because of the redistricting. Since the Democratic candidate won these two elections, the plaintiffs may now have a stronger § 2 theory—they will be able to point to losses in District Four's Justice Court, Supervisor's, and Election Commissioner's races. Today's outcome does not foreclose that (or some other) showing.

The racial distribution of central Mississippians has seen substantial changes in recent years. The record shows that in the 10 years between the 2000 and 2010 Censuses, for example, the black population of Hinds County increased by approximately eight percentage points. The Court suspects that that population shift has continued as white persons move to Madison and Rankin Counties. There is not sufficient evidence that the reduction of white persons elected to County-wide office is due to the redistricting as opposed to these demographic shifts.[21]

Plaintiffs did have another avenue by which to prove a violation of the Voting Rights Act. In § 2 cases, plaintiffs can combat the allure of conventional wisdom, and thus prove their theory of racial bloc voting, by introducing expert testimony of a statistical pattern of election

---

[20] This possibility accords with the analysis of the defendants' statistical expert, who explained that white voters in Hinds County "voted much less along the lines of race and voted more along the lines of political party." Morgan, however, told a newspaper reporter that he lost because of Democratic turnout and not race. He explained that at the top of the ballot the year he was first elected, the Democratic candidate running for Governor was a truck driver running against a popular incumbent Governor. In the most recent election, though, a popular Democratic Attorney General was running for the gubernatorial seat in a hotly-contested race, and a Democratic Jackson City Council member was running for an open seat of the Public Service Commission district which contained Morgan's district. Gates, *Party or race?*, *supra* note 1.

[21] The legislative race of House District 64 is illustrative. All but one of its precincts lies in Hinds County. Since 1987, Republican Bill Denny represented the area. In 2011, Denny defeated Democrat Dorsey Carson by about 13 points. No one ran against Denny in 2015. In 2019, however, a political newcomer, Democrat Shanda Yates, defeated the eight-term incumbent with 51% of the vote. Ashton Pittman, *It's Official: Dem Shanda Yates Ousts 32-Year Republican in Mississippi House*, Jackson Free Press, Nov. 18, 2019.

results. The Fifth Circuit has, in fact, held in these cases that "a party *must* 'fine tune' any statistical proof offered to prove discrimination." *Mabus*, 932 F.2d at 410 (emphasis added). Although the degree of fine-tuning is not clear, other precedent confirms the principle that statistical evidence is critical to a successful showing. *See Veasey*, 830 F.3d at 250–51 (describing the "four distinct methods of analysis" utilized by the plaintiffs, as well as the expert testimony proffered by the State).

For whatever reason, Plaintiffs chose not to invest in this type of evidence. Instead, Perry brought a significant amount of credible information about Hinds County and Mississippi elections to the witness stand. He has a facility with summary statistics. Yet there is a material difference between summary statistics and the kind of specialized analysis—be it a regression or even a t-test—conducted by academics and statisticians who testify as experts in voting cases. *See, e.g.*, *id.*; *Thomas v. Bryant*, 938 F.3d 134, 160 n.126 (5th Cir.) (collecting cases for the proposition that "[ecological inference] analysis is widely recognized and accepted in voting cases"), *reh'g en banc granted,* 939 F.3d 629 (5th Cir. 2019); *Monroe v. City of Woodville, Miss.*, 881 F.2d 1327, 1331 (5th Cir. 1989), *opinion corrected on reh'g,* 897 F.2d 763 (5th Cir. 1990) (criticizing plaintiffs' expert for the "failure to provide a test of statistical significance"). Perry does not have that level of expertise, and did not conduct a statistically significant analysis showing that African-American voters in Hinds County vote sufficiently as a bloc to usually to defeat white voters' preferred candidate. Nor did the plaintiffs designate an expert to counter the defendants' statistical expert, Dr. D'Andra Orey, who conducted ecological regression and ecological inference analyses for Hinds County.

For these reasons, the § 2 claim must also be dismissed.

### 4. Other Federal Issues

The plaintiffs' Amended Complaint presses other concerns related to federal law, namely, an alleged 2,900-person undercount by the U.S. Census at three local universities, the Supervisors' failure to submit all proposed plans to the Department of Justice, and the Supervisors' failure to submit accurate information to the Department of Justice. The Amended Complaint presents these issues as evidence of excessive partisanship but also demarcates them as independent causes of action.

Taking all of these concerns as true, it is not obvious how federal law can remedy them in this suit. Testimony revealed that any undercount must be (and so far has not been) taken up with the U.S. Census Bureau, which is not a party to this action. And the concerns about the Department of Justice raise a question about the adequacy of the federal government's Voting Rights Act preclearance process—a process which does not exist anymore, and arguably was not legally binding from summer 2006-onward. *See Shelby Cty., Ala. v. Holder*, 570 U.S. 529 (2013).

For these reasons, the Court is not confident that anything can be done about these issues under federal law, at least with these parties. That said, the undersigned does think that the Supervisors' actions with respect to the Department of Justice's inquiries have some bearing on the plaintiffs' state-law claims, and will return to them in the below discussion.

### B. State Claims

Precedent suggests that the undersigned should proceed to adjudicate the plaintiffs' state-law claims. *See Brookshire Bros. Holding v. Dayco Prod., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009); *Mendoza v. Murphy*, 532 F.3d 342, 347 (5th Cir. 2008). That analysis is below.

### 1.    Open Meetings Act

The Mississippi Legislature has determined "that the formation and determination of public policy is public business and shall be conducted at open meetings except as otherwise provided herein." Miss. Code Ann. § 25-41-1. The State's Open Meetings Act defines "meeting" as "an assemblage of members of a public body at which official acts may be taken upon a matter over which the public body has supervision, control, jurisdiction or advisory power, including an assemblage through the use of video or teleconference devices that conforms to Section 25-41-5." *Id.* § 25-41-3(b).

The statute continues,

> An agenda and materials that will be distributed to members of the public body and that have been made available to the staff of the public body in sufficient time for duplication and forwarding to the members of the public body shall be made available to the public at the time of the meeting. Votes taken during any meeting conducted through teleconference or video means shall be taken in a manner that is clearly audible or visible to all members of the public body and to members of the public present at the public location.

*Id.* § 25-41-5(3).

"The Open Meetings Act was enacted for the benefit of the public and is to be construed liberally in favor of the public. The philosophy of the Open Meetings Act is that *all* deliberations, decisions and business of *all* governmental boards and commissions, unless specifically excluded by statute, shall be open to the public." *Hinds Cty. Bd. of Sup'rs v. Common Cause of Mississippi*, 551 So. 2d 107, 110 (Miss. 1989) (quotation marks and citations omitted).

In this case, the video of the Supervisors' February 21 work session reveals objections from members of the public as to the process by which the Board decided to redistrict. There

were no handouts provided at that work session, and citizens were upset that information was posted to the County's website only earlier that day.

These procedural concerns were not fixed in the intervening week; citizens voiced similar objections at the February 28 meeting. When Supervisor Fisher – dialing in from Afghanistan – expressed concern that Johnson's recommended plans were not posted online, after an awkward silence, County staff were forced to concede that Map 1 was not there. One member of the public stood up and objected that this was the first time anyone had seen the plans; no one had had time to digest them. Another member of the public agreed, saying the maps had not been provided at the prior week's planning session. A Supervisor tried to explain that the maps were completed over the intervening weekend, but then couldn't explain why Map 1 wasn't on the website. Rosemary Aultman, the then-Mayor of Clinton, stood up and explained how unfair it was that the maps had not been provided for advance public review.

This evidence indicates that Hinds County's failure to inform the public about Maps 1-4 before February 28 violated the spirit of the Open Meetings Act. The Court cannot, however, conclude that the County violated the letter of the Act, as the statute requires only that materials "be made available to the public *at the time of the meeting*." Miss. Code Ann. § 25-41-5(3) (emphasis added). The videos of the February 28 meeting show that the County did print and display large-format versions of Maps 1-4 for the public to review *at the meeting*.

Even if there was no technical violation of the Open Meetings Act in that respect, the Supervisors violated the Act during the recess of the February 28 meeting. Mississippi law is clear that "'deliberations . . . that go into the making of' public policy are to be open to the public." *Mayor & City Council & City of Columbus v. Commercial Dispatch*, 234 So. 3d 1236, 1240 (Miss. 2017) (quoting Miss. Code Ann. § 25-41-1). The Court credits the party admission

of Supervisor Calhoun, as relayed through Perry's testimony, that "[w]hen we went into recess, we all agreed that we were going to go back out and [Supervisor] Doug Anderson was going to make the motion to adopt plan 3." That is a prototypical violation of sunshine laws.

The County may object to this finding and assert that any agreement was immaterial because Supervisor Calhoun changed her mind and moved to adopt Plan 1. That does not help the County. The violation of State law was complete when the Supervisors went behind closed doors and held "deliberations that 'go into making' or 'lead to' public policy . . . at a gathering of board members." *Id.* Those deliberations were not open to the public, and it cannot be seriously argued that they met some other exemption within the Open Meetings Act, such as the exemption for social gatherings. *See Gannett River States Pub. Corp. v. City of Jackson*, 866 So. 2d 462, 467 (Miss. 2004).

To be fair and thorough, Supervisor Calhoun denies having said this to Perry and further denies having a private meeting. But Perry's testimony was very specific, and a private meeting would be consistent with the County's dissembling in its § 5 preclearance communications to the Department of Justice. Recall that County officials told DOJ that they didn't have a copy of Perry's map—but they had refused to take a copy of Perry's map when he offered it at the meeting. The County then characterized the citizen who took the videos of the work session and redistricting meeting as a "Republican operative," as if that should somehow discourage DOJ's viewing of them. Since these videos are unedited and speak for themselves, the videographer's party affiliation is entirely gratuitous.[22] Lastly, the County's submissions to the Department of Justice contained a number of inaccuracies. Though these issues are not a basis for liability under

---

[22] "[T]he spirit of the [Open Meetings] Act is that a citizen spectator, including any representative of the press, has just as much right to attend the meeting and see and hear everything that is going on as has any member of the board or commission." *Hinds Cty.*, 551 So. 2d at 110 (citations omitted).

current federal law, they have bearing on whether the County sought to hide or discourage meaningful review of its redistricting process.

For these reasons, the Court concludes that Hinds County violated the Mississippi Open Meetings Act on February 28, 2011.

### 2. Mississippi Election Code

Next, the plaintiffs contend that Hinds County violated the Mississippi Election Code when it failed to provide sufficient information about its redistricting to the Mississippi Secretary of State. They point to three Code sections.

First, Mississippi law requires each Board of Supervisors to "notify the Office of the Secretary of State of the boundary of each supervisors district, sub-precinct and voting precinct as then fixed and shall provide the office a legal description and a map of each supervisors district, sub-precinct and voting precinct and shall indicate the voting place in each such district." Miss. Code Ann. § 23-15-281(1). Second, when redistricting occurs, state law requires the Supervisors to "notify the Office of the Secretary of State and provide the Office of the Secretary of State a legal description and a map of any boundary change. No change shall be implemented or enforced until the requirements of this section have been met." *Id.* § 23-15-283(1). Finally, "as soon as practicable after any change is made in any supervisors district, sub-precincts, voting precinct or any voting place, the board of supervisors shall cause the change to be entered on the minutes of the board in such manner as to be easily understood." *Id.* § 23-15-285. Westlaw indicates that these statutes have never been analyzed by a court of law in any detail.

The record evidence for and against these allegations is scant. According to Exhibit D-5, however, on September 20, 2012, Hinds County's attorney sent Assistant Secretary of State for Elections W. Heath Hillman a letter describing the County's new redistricting plan "[i]n

accordance with Mississippi Code Sections 23-15-281 and 23-15-283, et seq." The enclosures referenced in the letter do not appear to be in evidence. The plaintiffs have not submitted any evidence contradicting this letter. As a result, they do not have enough evidence to prove that the County is out of compliance with the Election Code for any failure to communicate with the Secretary of State's office.

The plaintiffs' remaining argument is that the County's redistricting failed to comply with § 23-15-285's mandate that changes be published on the minutes "in such manner as to be easily understood." The plaintiffs contend that legal descriptions would have been better than the maps the Supervisors attached to the minutes.

The Court must respectfully disagree. Maps are perhaps the simplest, easiest means for members of the public to understand how electoral changes apply to them, and are superior (for this purpose, at least) than formal legal descriptions. This bundle of claims must be dismissed.

C.      Remedies

Federal courts do not often order a remedy for a violation of Mississippi's Open Meetings Act. Such claims are usually adjudicated by a Chancery Court or the Mississippi Ethics Commission. *See* Miss. Code Ann. § 25-41-15. But for the length of time this case has been here, this Court would likely have declined supplemental jurisdiction over this claim in deference to those bodies. Yet here we are.

The Mississippi Supreme Court has held that a violation of the Open Meetings Act "may subject a board to an injunction or writ of mandamus," but does "not void the actions" of the board taken at the meeting. *Shipman v. N. Panola Consol. Sch. Dist.*, 641 So. 2d 1106, 1116 (Miss. 1994). The scope of the injunction or writ is not entirely clear, but in one case the court affirmed an order requiring "the Mayor and the City Council to refrain from *further* violations

and comply strictly with the Act." *Commercial Dispatch*, 234 So. 3d at 1238 (quotation marks and brackets omitted) (emphasis added).[23]

The undersigned is not sure it is appropriate for a federal court to issue an open-ended injunction against a local governmental entity to require compliance with *state* law. Fortunately, there appears to be an additional path of remedies in these cases.

According to the Mississippi Court of Appeals, "[i]f the court finds that a public body has willfully and knowingly violated the provisions of this chapter, the court may impose a civil penalty upon the public body in a sum not to exceed $100 plus all reasonable expenses incurred to bring suit to enforce the Act." *LaCroix v. Marshall Cty. Bd. of Sup'rs*, 28 So. 3d 650, 661 n.14 (Miss. Ct. App. 2009) (quotation marks and citation omitted).

Pursuant to this law, this Court expressly finds that the defendants' violation of the Open Meetings Act was willful and knowing. A $100 civil penalty is ordered and the plaintiffs shall receive the expenses and attorney's fees they reasonably incurred on this claim.

## IV.    Conclusion

The plaintiffs are granted relief on their claim under Mississippi's Open Meetings Act. The remainder of their claims are dismissed. A Final Judgment shall issue shortly.

The plaintiffs' motion for attorney's fees (with supporting evidence) is due in 21 days.

**SO ORDERED**, this the 8th day of January, 2020.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

---

[23] If the public body *subsequently* violates that order, a finding of contempt is warranted and attorney's fees may be awarded. *Compare Common Cause*, 551 So. 2d at 125 (awarding "fair and reasonable attorney's fees" to the plaintiffs where the public officials had violated a Chancery Court injunction) *with Bd. of Trustees of State Institutions of Higher Learning v. Mississippi Publishers Corp.*, 478 So. 2d 269, 282 (Miss. 1985) (disallowing attorney's fees); *accord In re: Phil Wolfe*, 2001 WL 283621 (Miss. A.G. op. Feb. 1, 2001).

## PROPOSED PLAN ADOPTED 2/28/11

| District | Population | White | Black | BVAP | Deviation | % Deviation | % White | % Black | % WHT VAP | % BLK VAP |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 50,747 | 17,148 | 32,056 | 22,522 | 1690 | 3.44% | 33.79% | 63.19% | 37.70% | 59.42% |
| 2 | 46,715 | 13,461 | 32,258 | 23,666 | -2342 | -4.77% | 28.82% | 69.05% | 31.05% | 67.00% |
| 3 | 51,182 | 3,951 | 46,284 | 30,432 | 2125 | 4.33% | 7.72% | 90.43% | 10.37% | 87.94% |
| 4 | 48,635 | 22,922 | 24,033 | 16,893 | -422 | -0.86% | 47.13% | 49.42% | 50.68% | 46.20% |
| 5 | 48,006 | 12,287 | 34,729 | 24,906 | -1051 | -2.14% | 25.59% | 72.34% | 28.65% | 59.48% |
| Total: | 245,285 | 69,769 | 169,370 | 118,419 | | | | | | |

Total:  9.10%

## Current Plan

| District | Population | White | Black | BVAP | Deviation | % Deviation | % White | % Black | % WHT VAP | % BLK VAP |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 48,853 | 18,110 | 29,148 | 20,585 | -204 | -0.42% | 37.07% | 59.66% | 41.17% | 55.73% |
| 2 | 46,312 | 10,775 | 34,665 | 25,573 | -2745 | -5.6% | 23.27% | 74.85% | 25.23% | 73.07% |
| 3 | 48,823 | 3,591 | 44,389 | 29,216 | -234 | -0.48% | 7.36% | 90.82% | 9.94% | 88.35% |
| 4 | 53,396 | 25,779 | 25,802 | 18,038 | 4389 | 8.84% | 48.32% | 48.32% | 51.89% | 45.00% |
| 5 | 47,901 | 11,514 | 35,416 | 25,007 | -1156 | -2.36% | 24.04% | 73.94% | 27.08% | 71.12% |
| Total: | 245,285 | 69,769 | 169,370 | 118,419 | | | | | | |

Total:  14.44%